962 A.2d 591 (2009)
404 N.J. Super. 514
CELANESE LTD., a Texas Limited Partnership, Plaintiff-Appellant,
v.
ESSEX COUNTY IMPROVEMENT AUTHORITY, Defendant-Respondent.
No. A-0241-07T2.
Superior Court of New Jersey, Appellate Division.
Argued September 16, 2008.
Decided January 16, 2009.
*593 Craig S. Provorny, Warren, argued the cause for appellant (Herold and Haines, attorneys; Anthony J. Reitano, of counsel; Mr. Provorny, on the briefs).
Michael H. Cohen, Florham Park, argued the cause for respondent (Schwartz Simon Edelstein Celso & Kessler, attorneys; Stephen J. Edelstein, of counsel; Mr. Edelstein, Mr. Cohen, and David M. Farkouh, on the brief).
Before Judges WEFING, PARKER, and LeWINN.
*594 The opinion of the court was delivered by
WEFING, P.J.A.D.
Plaintiff Celanese Ltd. ("Celanese") appeals from a trial court order granting summary judgment to defendant Essex County Improvement Authority ("Authority") dismissing its complaint. After reviewing the record in light of the contentions advanced on appeal, we reverse and remand for further proceedings.
Celanese[1] was the owner of a large parcel of land in a section of Newark zoned for industrial use. The property consisted of nearly twenty-five acres on both sides of Doremus Avenue, with the Passaic River on its eastern border and Plum Creek, which flows into the Passaic River, on its western and southern sides. The portion of the property abutting the Passaic River was referred to as the East Farm while the portion on the other side of Doremus Avenue was referred to as the West Farm.
For years, the property was used by companies in the chemical industry. From the mid-1920s to the mid-1950s, Texaco used the site as a petroleum distribution facility. Later, Celanese used it as a chemical bulk storage and distribution facility, with underground and aboveground piping linking the parcels on either side of Doremus Avenue. At one point, Celanese manufactured methanol and formaldehyde at the site.
As a result of those chemical-related uses, the property was contaminated with a variety of substances, a fact well-known to both parties. In 1986, Celanese entered into an Administrative Consent Order ("ACO") with the New Jersey Department of Environmental Protection ("DEP") for the clean-up of this site.
By the mid-1990s, Celanese began to close down its operations at this site and, having no further use for it, sought to market it. Essex County needed to build a new jail to replace its older facilities and undertook, through the Authority, to locate an appropriate site and construct a new jail. The Authority began to explore the feasibility of using the Celanese tract and retained consultants to advise it with respect to the potential benefits and detriments of the site. In 1995, for example, the Authority received an extensive report from EcolSciences, Inc., which was "intended to identify the presence of potentially contaminated areas of concern" on the property. That report noted that the site was listed on the Comprehensive Environmental Response, Compensation and Liability Information System. It pointed out that the System was a "compilation of USEPA [United States Environmental Protection Agency] known or suspected uncontrolled or abandoned hazardous waste sites [and] may ultimately be placed on the National Priorities List." EcolSciences noted twenty-six areas of potential environmental concerns, including surface water. As to this, its report stated the following:
The primary surface water features of the overall property are Plum Creek, a tidal stream which separates the Praxair and Celanese properties, and the Passaic River, which borders the eastern boundary.... Plum Creek flows under Doremus Avenue ... ultimately discharging into Newark Bay.... The majority of surface runoff on the Celanese facility is intercepted stormwater system which directs runoff to the local sanitary sewers.... Generally, undirected runoff on the East Farm drains to the Passaic River, while undirected runoff on the West Farm discharges to *595 Plum Creek or percolates into the ground. These drainage systems raise an environmental concern as to the potential for residual soil contamination and potential offsite migration of contaminants attributed to past and current industrial uses of both properties.
The Authority also retained John O. Lasser Associates, Inc. to appraise this land. Lasser's original appraisal was conducted in 1997. It was updated in 1998 and reported an appraised value of $7,088,000 as of March 1998. In May 1998, the Authority's then-counsel wrote to Celanese, enclosing a copy of both the Lasser appraisal and an April 1998 report from the Authority's environmental consultant, Camp Dresser & McKee. The letter transmitted an offer to purchase the property for its appraised value, with the Authority reserving "the right to pursue any legal remedies it may have, now or in the future, arising from any pre-existing environmental contamination to the property." Celanese responded by forwarding an appraisal prepared on its behalf, which concluded that the property had a fair market value of $8,130,000 as of March 1997. The appraisal noted that it had been conducted "as if [the property] were clean of any hazardous material."
The parties had met to discuss the matter, however, even prior to the May 1998 exchange of letters. The record before us, for example, contains an agenda of a meeting held on March 12, 1998, to discuss the Authority's potential acquisition of this site. Those attending included Celanese's in-house counsel and its outside counsel, the Authority's then-executive director, the Authority's environmental attorney, and a representative from Camp Dresser & McKee, the Authority's environmental consultant. The final items on the agenda dealt with groundwater and surface water remediation and listed the following topics to be addressed:
 Scope of CEA/duration/contaminants of concern
 Celanese future plans should NJDEP require remediation with regard to groundwater contamination
 Celanese future plans should NJDEP require remediation with regard to surface water contamination in Plum Creek and/or Passaic River
 Celanese/Environ's thoughts regarding source of naphthalene in groundwater
Following a period of detailed, comprehensive negotiations, in which both parties were assisted by counsel and environmental consultants, the parties executed a contract in September 1998 pursuant to which the Authority agreed to purchase the property for $6,400,000, substantially less than the Authority's original offer. In return for the reduction in price, the Authority agreed to assume Celanese's environmental responsibilities.
The contract contained detailed provisions that were specifically drafted in light of the known environmental contamination of the site.
Article 3.2 of the contract provided as follows:
Limitations on Representations or Warranties. PURCHASER ACKNOWLEDGES AND AGREES THAT, EXCEPT AS SPECIFICALLY SET FORTH IN ARTICLES 3.1(a) and 4.2, NEITHER SELLER, NOR ANY AGENT OR REPRESENTATIVE OF SELLER HAS MADE, AND SELLER IS NOT LIABLE OR RESPONSIBLE FOR OR BOUND IN ANY MANNER BY, ANY EXPRESS OR IMPLIED REPRESENTATIONS, WARRANTIES, COVENANTS, AGREEMENTS, OBLIGATIONS, GUARANTEES, STATEMENTS, INFORMATION OR *596 INDUCEMENTS PERTAINING TO THE PROPERTY OR ANY PART THEREOF, TITLE TO THE PROPERTY, THE PHYSICAL CONDITION THEREOF, THE FITNESS OR QUALITY THEREOF, THE VALUE OR PROFITABILITY THEREOF, OR ANY OTHER MATTER OR THING WHATSOEVER WITH RESPECT THERETO INCLUDING, BUT NOT LIMITED TO, THE ENVIRONMENTAL CONDITION OF THE PROPERTY. PURCHASER ACKNOWLEDGES, AGREES, REPRESENTS AND WARRANTS THAT IT HAS BEEN PROVIDED SUCH ACCESS TO THE PROPERTY AND SUCH OTHER MATTERS AND TO INFORMATION AND DATA RELATING TO ALL OF SAME AS PURCHASER HAS CONSIDERED NECESSARY, PRUDENT, APPROPRIATE OR DESIRABLE FOR THE PURPOSES OF THIS TRANSACTION AND, WITHOUT LIMITING THE FOREGOING, THAT PURCHASER AND ITS AGENTS AND REPRESENTATIVES HAVE BEEN GIVEN THE OPPORTUNITY TO INDEPENDENTLY INSPECT, EXAMINE, INVESTIGATE, ANALYZE AND APPRAISE ALL OF SAME, WITHOUT LIMITING THE FOREGOING, EXCEPT AS SPECIFICALLY SET FORTH IN ARTICLES 3.1(a) AND 4.2, PURCHASER ACKNOWLEDGES AND AGREES THAT NEITHER SELLER NOR ANY DIRECTOR, OFFICER, SHAREHOLDER, PARTNER (LIMITED OR GENERAL), MANAGER, MEMBER, EMPLOYEE, AGENT OR REPRESENTATIVE OF SELLER IS LIABLE OR RESPONSIBLE FOR OR BOUND IN ANY MANNER BY (AND PURCHASER HAS NOT RELIED UPON) ANY VERBAL OR WRITTEN OR SUPPLIED REPRESENTATIONS, WARRANTIES, COVENANTS, AGREEMENTS, OBLIGATIONS, GUARANTEES, STATEMENTS, INFORMATION OR INDUCEMENTS PERTAINING TO THE PROPERTY OR ANY PART THEREOF, OR ANY OTHER INFORMATION RESPECTING SAME FURNISHED BY OR OBTAINED FROM SELLER OR ANY AGENT OR REPRESENTATIVE OF SELLER. PURCHASER ACKNOWLEDGES AND AGREES THAT, EXCEPT AS SPECIFICALLY SET FORTH IN ARTICLES 3.1(a) and 4.2, PURCHASER IS PURCHASING THE PROPERTY "AS IS" AT THE DATE HEREOF, INCLUDING, BUT NOT LIMITED TO, THE ENVIRONMENTAL CONDITION OF THE PROPERTY.
Paragraph 3.1(a)(iii) provided that, "Except as set forth in Schedule 3.1(a)(iii), to the best of [plaintiff's] knowledge, no third party personal injury suits (excluding worker's compensation claims) are pending or threatened against [plaintiff] arising from alleged exposure to Contaminants (as hereinafter defined) at or emanating from the Property." Schedule 3.1(a)(iii) identified the following as a potential claim:
The [EPA] has declared the sediment in the Passaic River/Newark Bay a superfund site, which is also known as the "Diamond Alkali Superfund Site." [Plaintiff] received and answered a CERCLA [Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA")] 104(e) information request. A company known as Chemical Land Holdings (apparently the successor to Diamond-Shamrock) is subject to a consent order with [the EPA] to study the sediment problem. Chemical Land Holdings asked many parties (including [plaintiff]) to fund the required study. However, since [plaintiff] is an organic *597 chemical company and the sediment problems are from PCB's, dioxin and metals, [plaintiff] declined to participate.
Article 4 allocated responsibility between the parties for the environmental conditions of the property. In Article 4.2, the Authority acknowledged that it had "investigated all matters relating to the ISRA [Industrial Site Recovery Act] Cases and the ACO and has performed its own sampling and testing of soil and groundwater at the Property." It also acknowledged that Celanese had made available to it all the files of its environmental consultant, Environ, Inc., and appended to the contract a list of those documents.
Article 4.5 of the contract is the focus of the parties' dispute. Subparagraph (a) provided:
Except as set forth in section 4.5(b) below, Purchaser hereby releases and shall defend, indemnify and hold harmless Seller, its predecessors in title which were or are related to Seller as parent, subsidiary, sibling or other affiliated entity, and all prior Owners and Operators (as those terms are defined by Environmental Laws) which were or are related to Seller as parent, subsidiary, sibling, or other affiliated entity, and all of their respective successors, assigns, directors, officers, shareholders, partners (general and limited), members, managers, parent entities, brother/sister entities, agents, and legal representatives from any and all claims, demands, liabilities, actions, suits, debts, causes of action, obligations, controversies, expenses, penalties, fees, accounts, damages, personal injuries, losses, judgments and costs (including attorneys' fees and expert witness fees) of every kind and character whatsoever, in law, equity or otherwise, whether compensatory, consequential or punitive in nature, and whether based upon present or future laws, in tort, contract or any other present or future theory of liability, arising, directly or indirectly, from or related to (1) the presence of Contaminants on or emanating from the Property without regard to the date such Contaminants were first placed or discharged on or about the Property, (2) all obligations contained in the DER, (3) the requirement to or failure to install and maintain engineering controls, (4) the ISRA Cases and the ACO, and (5) all injuries and damages of any kind whatsoever related directly or indirectly to or arising from any of the foregoing.
This language was limited by subparagraph (b) which provided:
Notwithstanding any provisions of Section 4.5(a) above to the contrary, Seller hereby releases and shall defend, indemnify and hold harmless Purchaser, its Commissioners, officers, employees, agents and legal representatives and the County of Essex if it acquires title to the Property from the Purchaser, from any and all claims, demands, liabilities, actions, suits, debts, causes of action, obligations, controversies, expenses, penalties, fees, accounts, damages, losses, judgments and costs (including attorney fees and expert witness fees) asserted by third parties (i) for personal injury arising from alleged exposure to Contaminants prior to the Closing Date, and (ii) resulting from the failure of the Seller to perform the Dowtherm Area Work and active groundwater remediation to the extent required as set forth in article 4.4(a)(i) and (ii).
Further, the contract defined "environmental laws" to include "any and all present or future federal, state and local laws, statutes, ordinances, regulations and executive orders and common or decisional law in any way related to pollution or the *598 protection of human health or the environment."
Additionally, Article 4.6 stated that all the provisions of Article 4 would survive the closing, be incorporated into the deed and "run with the land such that its provisions are binding on Purchaser and any subsequent owners of the Property, jointly and severally, for the benefit of Seller."
Finally, the contract contained the following article:
In interpreting any provision of this Agreement, no weight shall be given to, nor shall any construction or interpretation be influenced by, the fact that counsel for one of the parties drafted this Agreement, each party recognizing that it and its counsel have had an opportunity to review this Agreement and have contributed to the final form of same.
Some five years after the closing, in October 2003, Celanese received a letter from the Environmental Protection Agency ("EPA") which contained the following:
EPA has documented the release or threatened release of hazardous substances, pollutants and contaminants into the six-mile stretch of the river, known as the Passaic River Study Area, which is part of the Diamond Alkali Superfund Site ("Site") located in Newark, New Jersey. Based on the results of previous CERCLA remedial investigation activities and other environmental studies, including a reconnaissance study of the Passaic River conducted by the United States Army Corps of Engineers ("USACE"), EPA has further determined that contaminated sediments and other potential sources of hazardous substances exist along the entire 17-mile tidal reach of the Lower Passaic River. Thus, EPA has decided to expand the Study to include the areal extent of contamination to which hazardous substances from the six-mile stretch were transported; and those sources from which hazardous substances outside the six-mile stretch have come to be located within the expanded Study Area.
By this letter, EPA is notifying [Celanese] of its potential liability relating to the Site pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a). Under CERCLA, potentially responsible parties ("PRPs") include current and past owners of a facility, as well as persons who arranged for the disposal or treatment of hazardous substances at the Site, or the transport of hazardous substances to the Site.
. . . .
For the first phase of the Lower Passaic River Project, the governmental partners are proceeding with an integrated five- to seven-year study to determine an appropriate remediation and restoration plan for the river. The study will involve investigation of environmental impacts and pollution sources, as well as evaluation of alternative actions, leading to recommendations of environmental remediation and restoration activities.... EPA will be seeking its share of the costs of the study from PRPs. Based on information that EPA evaluated during the course of its investigation of the Site, EPA believes that hazardous substances were being released from [Celanese's] facility located at 354 Doremus Avenue in Newark, New Jersey, into the Lower Passaic River. Hazardous substances, pollutants and contaminants released from the facility into the river present a risk to the environment and the humans who may ingest contaminated fish and shellfish. Therefore [Celanese] may be potentially liable for response costs which the government may incur relating to the study of the Lower Passaic River. In addition, responsible parties may be required to pay damages *599 for injury to, destruction of, or loss of natural resources, including the cost of assessing such damages.
. . . .
EPA will be holding a meeting with all PRPs on October 29, 2003 at 10:00 AM in Conference Room 27A at the Region 2 office. At that meeting, EPA will provide information about the actions taken to date in the Lower Passaic River, as well as plans for future activities. After the presentation, PRPs will be given the opportunity to caucus, and EPA will return to answer any questions that might be generated during the private session. Please be advised that due to increased security measures, all visitors need to be registered with the security desk in the lobby in order to gain entry to the office. In order to ensure a smooth arrival, you will need to provide EPA with a list of attendees no later than October 15, 2003.
EPA recommends that the cooperating parties select a steering committee to represent the group's interest as soon as possible, since EPA expects a funding commitment for the financing of the CERCLA share of the $20 million study by mid-November 2003.
On October 16, Celanese forwarded a copy of this letter to the Authority, invoking the indemnification language of Article 4.5, set forth above. Celanese requested that the Authority arrange to have a representative attend a meeting scheduled for October 23, 2003, at which interested private parties who had also received this letter could discuss the matter in advance of meeting with the EPA. Celanese also asked the Authority to call to discuss the arrangements for the defense and indemnification of Celanese.
The Authority did not respond. On October 27, Celanese wrote again, advising the Authority of what had transpired at the October 23 meeting, informing it of the meeting scheduled for October 29, and again referring to the contractual agreement for the Authority to defend and indemnify Celanese. It also enclosed the draft of a proposed joint defense agreement to be executed by the Authority and Celanese.
Again, the Authority did not respond. On November 21, 2003, Celanese wrote a third time, outlining that it estimated the cost of participating in the EPA's proposed settlement to range from about $350,000 to $500,000 and that the EPA was demanding a response by November 26, 2003. It requested the Authority's views on the issue and reiterated that it would be looking to the Authority for defense and indemnification under the contract. Again, the Authority did not respond.
On January 13, 2004, Celanese filed suit, requesting a judgment declaring that the Authority was contractually obligated to defend and indemnify Celanese with respect to all claims by the EPA concerning the Lower Passaic River. Shortly after the Authority filed its answer, both parties moved for summary judgment. The trial court concluded that the language contained within the indemnification clause, in particular the phraseology "the presence of Contaminants on or emanating from the Property," was ambiguous. It denied summary judgment without prejudice to permit the parties to engage in discovery.
At the conclusion of discovery, the parties again moved for summary judgment. Defendant contended that its agreement to defend and indemnify Celanese extended only to contaminants that emanated from the property after the date of closing. It argued it had no obligation to indemnify Celanese for any contaminants that had migrated from the property prior to the date of closing. Thus, it argued, it bore no responsibility for the EPA's proposed *600 clean-up of the Passaic River, for it had become contaminated long before the Authority took title.
Celanese, on the other hand, contended that the language clearly encompassed the Passaic River clean-up. It noted that the contract's indemnification clause contained three express exceptions, or "carve-outs," as the parties referred to them. These were personal injury suits, if any were filed, the cost of remediating groundwater contamination if it exceeded $1.5 million, and soil remediation in an area defined as "Dowtherm." Since potential CERCLA liability for contamination of the Passaic River was not excluded, it was, according to Celanese, encompassed within the indemnifying language of the contract.
The trial court, as noted at the outset of this opinion, granted defendant's motion and dismissed plaintiff's complaint. This appeal followed.
The court issued a detailed letter opinion in conjunction with its order, setting forth its reasons for concluding that the contract language was ambiguous and, under principles governing the interpretation of indemnification agreements, held that the contract language did not express a clear intent by the Authority to indemnify Celanese for the off-site contamination of the Passaic River that occurred prior to the Authority's purchase of the property. Mobay Corp. v. Allied-Signal, Inc., 761 F.Supp. 345, 358 (D.N.J.1991); George M. Brewster & Son, Inc. v. Catalytic Constr. Co., 17 N.J. 20, 30, 109 A.2d 805 (1954).
In the view of the trial court, Article 4.5(a) of the contract was ambiguous in that the intention of the parties was unclear when they agreed that the Authority would indemnify Celanese against "present or future ... liability, arising, directly or indirectly, from or related to (1) the presence of Contaminants on or emanating from the Property without regard to the date such Contaminants were first placed or discharged on or about the Property...." The ambiguity perceived by the trial court was whether the parties, in using the phrase "emanating from" had intended the phrase as a geographical descriptor, i.e., referring to the source of the contamination, or a temporal descriptor, i.e., referring to when the contamination migrated from the property, either before the contract was executed or after it was executed.
The trial court acknowledged that at other points in the contract the parties had used the phrase "emanating from" as a geographic descriptor, defining the source of the contamination, without regard to when the contamination migrated from the property. However, it rejected Celanese's argument that the use of the same phrase in other places in the contract indicated its meaning within Article 4.5(a).
Certain principles guide our analysis. The interpretation of a contract is ordinarily a legal question for the court and may be decided on summary judgment unless "there is uncertainty, ambiguity or the need for parol evidence in aid of interpretation...." Great Atl. & Pac. Tea Co. v. Checchio, 335 N.J.Super. 495, 502, 762 A.2d 1057 (App.Div.2000). "The interpretation of the terms of a contract are decided by the court as a matter of law unless the meaning is both unclear and dependent on conflicting testimony." Bosshard v. Hackensack Univ. Med. Ctr., 345 N.J.Super. 78, 92, 783 A.2d 731 (App.Div.2001).
In interpreting a contract, a court must try to ascertain the intention of the parties as revealed by the language used, the situation of the parties, the attendant circumstances, and the objects the parties were striving to attain. Onderdonk v. Presbyterian Homes of N.J., 85 N.J. 171, 183-84, 425 A.2d 1057 (1981) *601 (citing Atl. N. Airlines v. Schwimmer, 12 N.J. 293, 301, 96 A.2d 652 (1953)); Driscoll Constr. Co. v. State, 371 N.J.Super. 304, 313, 853 A.2d 270 (App.Div.2004). Thus, in ruling on a summary judgment motion that involves the interpretation of a contract, a court must necessarily determine whether there is any genuine issue of material fact regarding the parties' intentions.
While we agree with the trial court that there may be no rule on contract interpretation requiring that the same phrase be given the same meaning throughout the contract, we do not agree with the trial court's apparent ease in attributing different meanings to the same phrase used at different places in the same contract.
One of the principles of statutory construction is that "identical words used in different parts of the same act are intended to have the same meaning." Gustafson v. Alloyd Co., 513 U.S. 561, 570, 115 S.Ct. 1061, 1067, 131 L.Ed.2d 1, 12 (1995) (quoting Dep't of Revenue of Or. v. ACF Industries, Inc., 510 U.S. 332, 342, 114 S.Ct. 843, 849, 127 L.Ed.2d 165, 175 (1994)). We recognize that in the present matter we are called upon to interpret a contract, rather than a statute, but we can perceive no reason in logic or policy why that principle should not be equally applicable here, particularly when the contract under consideration is so clearly the product of careful lawyering on both sides.
The trial court recognized that the phrase "emanating from" used in other places in the contract denoted only the source of the contamination and did not refer to when the contamination migrated off-site. Our review of the contract discloses no reason to give a different meaning to the phrase "emanating from" within Article 4.5(a). Within that article, the Authority facially undertook to indemnify Celanese for its environmental responsibilities without regard to when the contamination emanated from the Celanese property.
Having found an ambiguity within the contract, the trial court then proceeded to resolve that ambiguity by applying the well-settled principle that an ambiguous indemnity clause "should be strictly construed against the indemnitee. Thus, a contract will not be construed to indemnify the indemnitee against losses resulting from its own negligence unless such an intention is expressed in unequivocal terms." Ramos v. Browning Ferris Indus. of S. Jersey, Inc., 103 N.J. 177, 191, 510 A.2d 1152 (1986). "[T]o bring a negligent indemnitee within an indemnification agreement ... the agreement must specifically reference the negligence or fault of the indemnitee." Englert v. Home Depot, 389 N.J.Super. 44, 52, 911 A.2d 72 (App.Div.2006) (quoting Azurak v. Corp. Prop. Investors, 175 N.J. 110, 112-13, 814 A.2d 600 (2003)), certif. denied, 192 N.J. 71, 926 A.2d 855 (2007).
We question the applicability of that concept to the present matter, in which we are dealing with an indemnity agreement with respect to obligations imposed by environmental laws, an area in which fault is not material. Here, Celanese did not seek indemnification for a prior negligent act it may have committed. It sought indemnification under environmental laws, in which strict liability without regard to fault is the operative principle. We do not directly rule upon that question, however, because the trial court did not directly address it in its letter opinion.
Under CERCLA, 42 U.S.C.A. § 9607(e), indemnity agreements are enforceable between private parties but not against the government. Thus, an indemnity agreement cannot nullify a party's own CERCLA liability, but can shift the ultimate financial loss. SmithKline Beecham *602 Corp. v. Rohm & Haas Co., 89 F.3d 154, 158 (3d Cir.1996); Hatco Corp. v. W.R. Grace & Co., 59 F.3d 400, 404 (3d Cir.1995); Mobay Corp., supra, 761 F.Supp. at 355. It has been held that if parties "wish to redistribute the risks distributed by Congress, they must do so clearly and unequivocally." Id. at 357 (quoting Chem. Waste Mgmt., Inc. v. Armstrong World Indus., Inc., 669 F.Supp. 1285, 1295 (E.D.Pa.1987)). "[I]n order for the Court to interpret a contract as transferring CERCLA liability, the agreement must at least mention that one party is assuming environmental-type liabilities." Id. at 358 (footnote omitted).
In interpreting the language of such an indemnity agreement, a court can recognize that, although each party may breach its own independent duty to the government under CERCLA's strict liability provisions, between themselves their status may be different. Curtis T. Bedwell and Sons, Inc. v. Geppert Bros., Inc., 280 N.J.Super. 391, 399, 655 A.2d 483 (App.Div.1995), appeal dismissed, 143 N.J. 481, 672 A.2d 1165 (1996). Nothing precluded these parties, negotiating at arm's length and both assisted by counsel and environmental consultants, from allocating between themselves the environmental risks attendant to this site.
The trial court found this agreement ambiguous not only with respect to the meaning of the phrase "emanating from" but also with respect to the structure of Article 4.5(a)(1) and 4.5(b). It turned to the deposition testimony and documents produced during discovery to resolve the perceived ambiguities. We agree with plaintiff that the trial court was incorrect in doing so. If the agreement was ambiguous, as the trial court twice concluded it was, then the trial court should not have attempted to resolve the ambiguity from a dry, paper record. Celanese was entitled to probe and challenge the credibility of the Authority witnesses in the presence of the factfinder.
The order under review is reversed, and the matter is remanded for further proceedings.
NOTES
[1] For ease of understanding, we refer to Celanese and its predecessors as "Celanese."