**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2804-19

CENTURY 21 – MAIN STREET
REALTY, INC., a New Jersey
corporation,

     Plaintiff-Respondent,

v.

ST. CECELIA'S CHURCH,
ISELIN, NEW JERSEY, a/k/a
ST. CECELIA'S CATHOLIC
CHURCH OF ISELIN, a/k/a
ST. CECELIA'S R.C. CHURCH,
a/k/a ST. CECELIA'S ROMAN
CATHOLIC CHURCH OF
ISELIN, NEW JERSEY, a/k/a
R.C. DIOCESE OF METUCHEN,

     Defendant-Appellant.

_____

Argued May 12, 2021 – Decided August 20, 2021

Before Judges Ostrer, Accurso, and Enright.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Docket No. L-4635-15.

Doris Cheung argued the cause for appellant (Norris McLaughlin, PA, attorneys; David C. Roberts, of counsel and on the briefs; Doris Cheung, on the briefs).

Bryan D. Plocker argued the cause for respondent (Hutt & Shimanowitz, PC, attorneys; Bryan D. Plocker, of counsel and on the brief).

PER CURIAM

This real-estate-commission dispute comes before us a second time. In our prior opinion, we held that the leasing agreement between St. Cecelia's Church ("the Church") and Century 21-Main St. Realty, Inc. ("Century") did not entitle Century to a commission on the Church's twenty-six-month no-rent lease of its school building to the Edison Board of Education. Century 21-Main St. Realty, Inc. v. St. Cecelia's Church, No. A-2506-15 (App. Div. Sept. 6, 2017) (Century I). Therefore, we affirmed as modified an order dismissing the complaint.

But we said Century could file an amended complaint. And it did. In that amended complaint, it sought a commission on a six-month "holdover period" that followed the initial lease — a period during which the Board paid rent. In a subsequent motion to dismiss, the Church argued (unsuccessfully) that the leasing agreement only authorized a commission if the lease were renewed for a year, not for a six-month holdover term.

A-2804-19

Eventually, Century filed for summary judgment. In opposing Century's motion and supporting its own cross-motion for summary judgment, the Church contended that before it leased its building to the Board, the Church and Century terminated the leasing agreement, replacing it with a sales agreement. But the trial court ultimately rejected the Church's argument that factual issues barred summary judgment. It granted Century summary judgment and a pro-rata commission on the $900,000 that the Board paid for a six-month holdover term.

On appeal from the court's summary-judgment orders, the Church again argues that the sales agreement superseded the leasing agreement and that, in any event, the leasing agreement did not authorize a pro-rata commission for half a year.[1]

We reverse in part and affirm in part. We agree that the leasing agreement's viability is genuinely disputed. Therefore, the court should not have granted Century summary judgment. But, because of the same factual disputes, we affirm the court's denial of the Church's cross-motion. We also reject the Church's argument that even if the leasing agreement survived, Century had no right to a commission.

---

[1] In its notice of appeal, the Church should have identified the motion-to-dismiss order rejecting its argument that a pro-rata commission was unauthorized. However, Century does not object on that ground.

A-2804-19

I.

In May 2012, Century and the Church entered into an exclusive listing agreement to lease the Church's inactive school building in Iselin. The parties used a pre-printed form, prepared by Middlesex County Multiple Listing System, Inc. ("MLS"), which included terms granting a broker the exclusive right to sell and lease a property. Because the Church did not want to market the property for sale at the time, the parties did not fill in the blank for the property's sale price. They did, however, fill in the blanks pertaining to leasing. The agreement granted Century "the sole and exclusive right to sell the property known as 1300 Oak Tree Road, Iselin for $_____ acceptable terms cash, conv to lease or rent the property at a monthly rate of $25 sq ft, beginning on 5/21/12 and continuing until midnight 5/21/13."[2]

Notwithstanding the omission of a sale price, the agreement set commission rates for a sale, a lease, and, importantly, a lease renewal, stating that the Church would pay Century

> a Sale Commission of 6%; a Lease or Rental Commission of 1 month, and a Lease Renewal Commission of 1 month on each one-year renewal of the lease if, the sale or exchange, or lease of this property or any part of it, is made by [Century],

---

[2] We indicate the blanks, which the parties filled in by hand, by underlining.

A-2804-19

cooperating agent, [the Church], or any person during the term of this listing agreement.

The agreement stated that the MLS would "publish[] and distribute[]" the listing. It also included an integration clause, stating "[t]here are no other agreements or conditions other than those stated in this listing agreement and its attachments."

On February 26, 2013, about three months before the agreement expired, Century obtained the Church's agreement, in the form of a handwritten note, "to extend the listing[] on [the property]" until June 30, 2014. The note referred to the MLS rental-listing number for the school property — MLS #215293. Century asserts that the note extended the term of the listing agreement; the Church contends that it only extended the MLS listing.

Two months after the parties allegedly extended the leasing agreement, they entered into another listing agreement, this time authorizing Century to find a buyer for the property. Using a fill-in-the-blank form similar to the first one, the April 18, 2013 agreement set a sales price and sales commission, but not a rental amount or a rental commission. The agreement granted Century "the sole and exclusive right to sell the [p]roperty . . . for $5,000,000 . . . , to lease or rent the property at a monthly rate of $ -----, beginning on 4/18/13 and continuing until midnight 5/31/14." Furthermore, the Church agreed to pay Century "a Sale

A-2804-19

Commission of 6%; a Lease or Rental Commission of -------, and a Lease Renewal Commission of -------- on each one-year renewal of the lease." A separate MLS listing, with a separate number, MLS #1312366, followed the second agreement.

The Church contends that the second agreement supplanted the first. It relies on the form's integration clause, which stated, "There are no other agreements or conditions other than those stated in this listing agreement and its attachments" (of which there were none). In addition, Father Jerome Johnson, who was St. Cecelia's pastor between 1999 and 2014, testified in deposition that the Church sought a sale after concluding that leasing the property was "no longer an option." Furthermore, after the second agreement, Century sent the Church only sales-related inquiries, and in a letter sent eight months after the second agreement, Century's broker of record, Barbara J. Sancilardi, only discussed sales. Specifically, Sancilardi wrote that her office then had the "property listed for sale." She recounted her efforts to find a buyer. And she noted that after unsuccessful efforts to lease the property, "it became apparent [leasing] was not a viable source of revenue for St. Cecelia's," but that "[i]n April 2013, [Century] listed the property for sale and had many showings."

By contrast, Century contends that the two agreements complemented each other. The integration clause, Century argues, meant only that no other agreements concerned the sale of the property. Sancilardi also certified that, after the parties entered the second agreement, both the rental and sales MLS listings remained active and Century marketed the property for both sale and lease.

Furthermore, letters from the diocesan general counsel asked Century to cease sales efforts, but not leasing efforts. In one letter, the diocesan general counsel told Century that the "complexity" of selling the school property led the Diocese to decide "that it [was] not interested in pursuing a sale of the property at this time." He added, "Accordingly I ask that you please remove the listing . . . so that the property is no longer on the market." When Sancilardi, two months later, presented the general counsel with a prospective buyer's letter of intent to purchase, he rejected it and again informed Century that "[t]he property [was] not for sale."

Complications arose in April 2014, when the Church — while the leasing agreement remained in effect, according to Century — leased the school property to the Edison Board of Education, which needed a temporary facility to replace an elementary school that a fire had severely damaged. The lease

7

permitted the Board to use the school "rent free" for an initial twenty-six-month "term," but, if the Board continued to occupy the school after the term, it required the Board to pay the Church $900,000 for each of two six-month "[h]oldover [t]erms" (or any part thereof) to which the Board was "entitled." The lease did not require the Board to provide notice before remaining for a holdover term. It did require the Board to make some improvements to the property, and it allowed the Board to make others.[3]

Century then claimed a commission, which it calculated based on the value of the Board's repairs. Rebuffed by the Church, Century filed its first complaint, which invoked the parties' first agreement but did not mention the second. As we recounted in Century I, slip op. at 6-8, the Church's subsequent motion to dismiss for failure to state a claim focused on whether Century had a right to a commission based not on rent, but the value of improvements. The trial court held, and we agreed, that the leasing agreement did not entitle Century to a commission on that basis. Id. at 2. Although the agreement entitled Century to a commission equal to "1 month" of rent, the Church's lease with the Board

---

[3] We discussed the lease's provisions at greater length in Century I, slip op. at 4-5.

required no rent — at least for the lease's "twenty-six-month term." Id. at 10-13.

However, we held that the trial court should not have dismissed Century's complaint with prejudice; Century conceivably could amend its complaint to raise new claims, such as "a breach of the covenant of good faith and fair dealing," or to bolster claims we found fell short. Id. at 15-16. In addition, we noted that the Church "conceded that [plaintiff] was entitled to a commission if the Board availed itself of one or both 'holdover' periods." Id. at 16.

Century later filed its amended complaint, seeking a commission based on the Church's receipt of $900,000 rent for one holdover term. The Church unsuccessfully moved to dismiss Century's claim, arguing that the first agreement authorized a one-month commission only if the Church renewed the lease for one year of rent, not just for a six-month holdover term.

At some point after our decision, the Church's counsel also learned of the second agreement, which the Church now contends supplanted the first. But the trial court, granting Century's motion for summary judgment and denying the Church's cross-motion for summary judgment, concluded that the two agreements subsisted together: the first focused on leasing, and the second on sale. It also concluded that the Church extended the leasing agreement (not just

9

the MLS listing) to June 30, 2014 and never expressly terminated it. Ultimately, the trial court held that the listing agreement entitled Century to a $75,000 commission, which equaled half-a-month's rent for the half-a-year holdover term.

This appeal followed.

## II.

A trial court should not grant a motion for summary judgment if there is a genuine issue of material fact, that is, if "the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995). Applying that same standard on de novo review, see Globe Motor Co. v. Igdalev, 225 N.J. 469, 479 (2016), we conclude there is a genuine issue whether the leasing agreement survived the parties' sales agreement.

Although "[c]ontractual interpretation is a legal matter ordinarily suitable for resolution on summary judgment," EQR-LPC Urb. Renewal N. Pier, LLC v. City of Jersey City, 452 N.J. Super. 309, 319 (App. Div. 2016), aff'd o.b., 231 N.J. 157 (2017), "a court must necessarily determine whether there is any genuine issue of material fact regarding the parties' intentions," Celanese Ltd. v.

Essex Cty. Improvement Auth., 404 N.J. Super. 514, 528 (App. Div. 2009). We seek to ascertain "the reasonably certain meaning of the language used, taken as an entirety, considering the situation of the parties, the attendant circumstances, the operative usages and practices, and the objects the parties were striving to achieve." George M. Brewster & Son, Inc. v. Catalytic Constr. Co., 17 N.J. 20, 32 (1954); see also Cruz-Mendez v. Isu/Ins. Servs., 156 N.J. 556, 570 (1999); Celanese, 404 N.J. Super. at 528. Extrinsic "evidence is adducible only for the purpose of interpreting the writing — not for the purpose of modifying or enlarging or curtailing its terms, but to aid in determining the meaning of what has been said." Atl. N. Airlines, Inc. v. Schwimmer, 12 N.J. 293, 301-02 (1953).

If a contract is ambiguous (in other words, it is "susceptible to . . . two reasonable alternative interpretations," M.J. Paquet, Inc. v. N.J. Dep't of Transp., 171 N.J. 378, 396 (2002)), its resolution is a fact question, Michaels v. Brookchester, Inc., 26 N.J. 379, 388 (1958). If that fact question depends on "parol evidence . . . in aid of interpretation," the jury should resolve it, id. at 387, unless the court can resolve it based on the summary-judgment record, using the summary-judgment standard, In re Teamsters Indus. Emps. Welfare Fund, 989 F.2d 132, 136-37 (3d Cir. 1993) (stating that summary judgment is appropriate where, despite the contract's ambiguity, the parties' intention was

11

"not a genuine issue of material fact"). Put another way, if in the end "there is uncertainty, ambiguity or the need for parol evidence in aid of interpretation, then the doubtful provision should be left to the jury." Great Atl. & Pac. Tea Co. v. Checchio, 335 N.J. Super. 495, 502 (App. Div. 2000); see also Celanese, 404 N.J. Super. at 528 (stating that a court should not decide the meaning of a contract term on summary judgment if "the meaning is both unclear and dependent on conflicting testimony") (quoting Bosshard v. Hackensack Univ. Med. Ctr., 345 N.J. Super. 78, 92 (App. Div. 2001)).

Here, the contract and relevant extrinsic evidence do not fully reveal the parties' intent. The leasing agreement initially expired on May 21, 2013, but Father Johnson agreed to extend the MLS listing until June 30, 2014. The Church contends the extension pertained only to the listing, not the agreement. But we are unconvinced. Although the MLS listing and the listing agreement are discrete, it would make no sense to extend the first without the second. By authorizing Century to continue to market the property for lease through the MLS listing, Father Johnson authorized Century to earn a commission if it succeeded.

The genuine issue of fact pertains to whether the parties terminated the first agreement before it expired. We note that we do not consider the sales

agreement to be a "substituted contract" for the leasing agreement. A contract supersedes an "earlier contract and becomes the only agreement on the part of the parties on the subject matter" if the later contract "cover[s] the same subject matter and [is] made by the same parties, but contain[s] terms inconsistent with the former contract so that the two cannot stand together," Rosenberg v. D. Kaltman & Co., 28 N.J. Super. 459, 463-64 (Ch. Div. 1953); see also 13 Corbin on Contracts § 71.1 (rev. ed. 2021) (stating that a court considering a "substituted contract" claim must construe "the two contracts . . . together" and, "[i]nsofar as they are inconsistent, the later one prevails; the remainder of the first contract, if consistent with the second in substance and in purpose, can be enforced"); but here, the agreement to sell, which included a set sales price and sales commission but no rental amount or rental commission, was compatible with the previous agreement to lease, which included a rental amount and rental commission but no sales price.

Rather, the factual issue of interpretation pertains to the integration clause, which declared that "[t]here are no other agreements or conditions other than those stated in this listing agreement." Because the parties present plausible, competing interpretations — Century contends the clause precluded other sale-

related agreements, while the Church contends it struck down the leasing agreement — we consider the clause ambiguous.

We decline to resolve this ambiguity by strictly construing the clause "against the party preparing it."  See Schor v. FMS Fin. Corp., 357 N.J. Super. 185, 193 (App. Div. 2002).  The contra proferentum doctrine "is only available . . . where the parties have unequal bargaining power."  Pacifico v. Pacifico, 190 N.J. 258, 268 (2007).  And we are not convinced that the Church, which was assisted at various points by in-house diocesan counsel, was significantly less sophisticated than a local real-estate office utilizing a third-party's form.[4]

But the parties' actions after entering the sales agreement may help resolve the ambiguity.  See Michaels, 26 N.J. at 388 (stating that "subsequent conduct of the parties in the performance of the agreement may serve to reveal their original understanding"); Restatement (Second) of Contracts § 202 cmt. g (Am. Law Inst. 1981) ("The parties to an agreement know best what they meant, and their action under it is often the strongest evidence of their meaning.").

---

[4] In any event, the doctrine is used as a "last resort," only when other tools fail to illuminate a contract's meaning.  Pacifico, 190 N.J. at 267-68.

A-2804-19

Favoring the Church's interpretation is Sancilardi's December 2013 letter, which referred only to the sales listing, recounted only sales efforts, and acknowledged that leasing was not a "viable" revenue source for the Church. Also, the multiple expressions of interest Century conveyed to the Church after April 2013 pertained only to sales, possibly reflecting Century's understanding that the leasing agreement was dead. Furthermore, when the diocesan general counsel directed Century to take the property off the market, he referred only to "pursuing a sale of the property," arguably reflecting the Church's understanding that only sales activity was then authorized.

Alternatively, the general counsel's silence about leasing could be evidence that the leasing option was still viable. And, while Sancilardi expressed a gloomy view of the property's leasing prospects, she certified that she never stopped trying to lease it and that the MLS listing for leasing continued alongside the MLS sale listing.

In sum, there exists a genuine issue of material fact regarding the viability of the leasing agreement. Therefore, summary judgment for Century was inappropriate. For the same reason, the Church was not entitled to summary judgment dismissal of the complaint on its cross-motion.

A-2804-19

We turn next to the Church's alternative argument: that even if the leasing agreement survived, Century was not entitled to any commission — not even a pro-rata commission — because the "1 month" renewal commission was payable only after a "one-year renewal of the lease," and the six-month holdover term was not a "one-year renewal."

We are not convinced that the six-month holdover term was a "renewal" at all. Notably, the Church's lease with the Board did not use the term "renewal." Rather, it established a base tenancy of twenty-six months, which the lease defined as the "Term," and the lease "entitled" the Board to extend the tenancy for up to two six-month periods, each defined as a "Holdover Term." The lease required the Board to pay $900,000 in rent for all or any part of a "Holdover Term." But it did not require the Board to provide any written notice before using a holdover term.

Despite the nomenclature, the Board did not hold over in the common-law sense. A landlord at common law may choose to deem a tenant who holds over as a tenant or a trespasser, Sheild v. Welch, 4 N.J. 563, 568 (1950) — but the Church did not have that choice here, because the Board was "entitled" to stay up to a year beyond the twenty-six months.

Nor did the Board "renew" the lease.  Rather, the "[h]oldover [t]erm" is best viewed as an "extension" of the original twenty-six-month term.  As Powell on Real Property explains:

> An "extension" is a continuation of the initial tenancy rather than a new tenancy, so that the lease containing an option to extend is regarded as a lease for the full possible extended period, terminable earlier by the tenant's election not to continue.  A "renewal," however, contemplates the creation of a new tenancy, separate and distinct from the initial one.  The difference is primarily relevant to the question of the manner of proper exercise by the tenant of the respective options.
>
> Since an extension is simply a continuation of the original tenancy, the tenant may validly exercise the option to extend by remaining in possession and paying rent.  However, because a renewal contemplates the creation of a new tenancy, the tenant must either secure the execution of a new lease from the landlord prior to the expiration of the initial lease, or at least signal the intention to renew by some affirmative act, usually by giving notice of renewal to the landlord, prior to that time.
>
> [2 Michael Allan Wolf, Powell on Real Property § 16B.05 (2021).]

Rather, Century's right to a commission seems grounded in the requirement that the Church pay "a Lease or Rental Commission of 1 Month." In Century I, slip op. at 10, we noted the parties agreed that "1 Month" meant

17

one month's rent; however, because there was no "rent" for the first twenty-six months, we held that Century was not entitled to a commission.

But during the holdover period, the Church did collect rent — $900,000 at the rate of $150,000 a month for six months. Notably, the leasing agreement did not condition the initial "1 month" commission on a minimum lease term (unlike the commission on the "renewal" term). Because Century did not cross-appeal, we do not decide whether Century was entitled to a full "1 month" of rent — or $150,000 — rather than the half-month that the trial court awarded. However, in a thirty-two-month tenancy in which the landlord received a total of $900,000 rent, perhaps "1 month" of rent was $28,125 ($900,000 x 1/32). We do not decide that either, as the Church did not make the argument.

To the extent not addressed, plaintiff's remaining arguments lack sufficient merit to warrant written discussion. R. 2:11-3(e)(1).

Affirmed in part and reversed in part. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

18

A-2804-19