**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0698-18T3

THERESA A. HALONSKI,

     Plaintiff-Respondent/
     Cross-Appellant,

     v.

PETER M. HALONSKI,

     Defendant-Appellant/
     Cross-Respondent.

_____

Argued February 24, 2020 – Decided June 11, 2020

Before Judges Ostrer, Vernoia and Susswein.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Morris County, Docket No. FM-14-0980-13.

John E. Clancy argued the cause for appellant/cross-respondent (Townsend Tomaio Newmark LLC, attorneys; John E. Clancy, on the briefs).

Ann Margot Edens argued the cause for respondent/cross-appellant, (Edens Law Group, LLC, attorneys; Ann Margot Edens, of counsel and on the brief; Thomas H. Vigneault, on the brief).

PER CURIAM

Defendant Peter M. Halonski appeals from a Family Part order interpreting the Marital Settlement Agreement (MSA) between him and his former spouse, plaintiff Theresa A. Halonski.[1] Peter contends the motion court improperly allocated credit to Theresa for mortgage principal pay-down during the period of time between the divorce and the eventual sale of the marital home. During that four-year-long transition period, in addition to paying alimony, Peter contributed to the monthly mortgage payments while Theresa continued to live in the marital home. Peter contends he is entitled to full reimbursement for the contributions he made to the mortgage payments during that period. He also contends the court improperly reduced Theresa's contribution to their daughter's higher education expenses.

After reviewing the record in light of the applicable legal principles and the text of the MSA, we are constrained to vacate the motion court's order and remand the case for additional fact finding. As to Peter's first contention, the motion court failed to interpret the MSA and discern how the parties intended to credit Peter for his monthly mortgage payments. The court instead credited

---

[1] Because both parties share the same last name, for the reader's convenience, we refer to them in this opinion by their first names.

A-0698-18T3

Peter in an amount the court deemed equitable based on the parties' relative contributions to the mortgage payments. Because the language employed in the MSA is subject to different interpretations, we remand for the motion court to determine what the parties intended when they negotiated and agreed upon the principal pay-down credit provision in the MSA.

As to the college contribution issue, we agree with the motion court that it was authorized to modify the contribution ratio to which the parties initially agreed. Handwritten language added to the MSA allowed the court to consider the parties' "ability to pay." However, in exercising the authority to modify the agreed-upon contribution ratio, the court fixed a new ratio without the benefit of information pertaining to the parties' income during one of the applicable calendar years. Furthermore, the motion court did not account for the alimony Peter paid to Theresa. Nor did the court make a finding that Theresa was not able to pay the percentage of college expenses that had been agreed upon and set forth in MSA. We therefore remand the case to the motion court to expand the record as needed and to make findings of fact and conclusions of law concerning the parties' ability to pay for their daughter's college education.

A-0698-18T3

I.

We presume the parties are familiar with the circumstances relating to this post-judgment matrimonial dispute. Accordingly, we need only briefly summarize those facts that are relevant to the issues before us. Theresa and Peter were married in 1979 and divorced in 2014. They executed an MSA that required Peter to pay Theresa $52,000 in alimony in addition to child support for their daughter. The MSA called for the sale of the former marital residence and specified how the proceeds from that sale would be distributed.

The MSA also specified each party's responsibility to pay for their daughter's first two years of college. Specifically, the MSA provided that Peter would pay 60% of her college expenses and Theresa would pay the remaining 40%. The MSA included a handwritten provision indicating this allocation could be revised based on their ability to pay.

Theresa lived in the marital residence when the parties divorced and was required under the MSA to list it for sale within four months.[2] The MSA allowed her to remain in the residence during what was supposed to be a "brief transition

---

[2] The MSA granted Theresa the "exclusive right to the occupancy of the marital premises now and forever," but provided that the former marital residence would be listed for sale no later than April 1, 2014, and would "remain continuously listed for sale and kept in broom-clean condition" until sold.

A-0698-18T3

period" until the property sold. During this transition period, the MSA required Peter to pay $2000 per month toward the mortgage. Theresa was responsible for the remaining $1700 of the monthly mortgage payment. Thus, Peter paid 54% of the $3700 monthly payment (2000/3700 = .54). The MSA expressly provided that Peter would receive a credit when the property sold "for whatever the pay-down on the principal was from the date of the execution of the agreement to the date of sale of the property provided for by the supplemental payment."

For reasons that are not made clear in the record, Theresa continued living in the marital residence for several years during which she did not list it for sale. Throughout that extended period, Peter continued to contribute $2000 per month toward the mortgage payment in addition to paying alimony.

The property finally sold in May 2018—more than four years after the date Theresa was expected to list the home under the MSA. Theresa subsequently filed a motion contending Peter should only receive credit for $9200 of the $115,010.85 mortgage pay-down, representing the additional 8% he paid over what she paid toward the mortgage. Peter filed a cross-motion arguing he should receive credit for all of his $2000 post-divorce mortgage

A-0698-18T3

payments. He also asked the court to compel Theresa to pay her MSA-mandated 40% share of their daughter's college expenses.

The motion court found Peter was entitled only to credit for roughly 54% of the mortgage principal pay-down, reflecting his share of the total monthly mortgage payments. The court also held that Theresa would only be responsible for 10% of their daughter's college expenses, rather than the 40% set forth in the MSA.

Peter now appeals from the Family Part's July 16, 2018, order and its subsequent September 28, 2018, order, denying his motion for reconsideration. He challenges the motion court's determination that he is only entitled to approximately 54% of the principal pay-down. He also contests the motion court's determination that Theresa is only responsible for 10% of their daughter's college expenses. He further argues with respect to both issues that the motion court erred in denying his requests for oral argument.

II.

We begin our analysis by acknowledging the legal principles that apply in this appeal. "The scope of appellate review of a trial court's fact-finding function is limited. The general rule is that findings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence." Cesare

A-0698-18T3

v. Cesare, 154 N.J. 394, 411–12 (1998) (citing Rova Farms Resort, Inc. v. Inv'rs Ins. Co., 65 N.J. 474, 484 (1974)). "We accord particular deference to the judge's factfinding because of 'the family courts' special jurisdiction and expertise in family matters.'" Clark v. Clark, 429 N.J. Super. 61, 70 (App. Div. 2012) (quoting Cesare, 154 N.J. at 413). We may reverse only if there is "'a denial of justice' because the family court's 'conclusions are [] "clearly mistaken" or "wide of the mark."'" Parish v. Parish, 412 N.J. Super. 39, 48 (App. Div. 2010) (alteration in original) (quoting N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008)).

In contrast to the deference we give to family courts' factual findings, "[t]o the extent that the [] court's decision constitutes a legal determination, we review it de novo." D'Agostino v. Maldonado, 216 N.J. 168, 182 (2013) (citing Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)). In particular, "a question regarding the interpretation or construction of a contract is a legal one and our review is plenary, with no special deference to the trial judge's interpretation of the law and the legal consequences that flow from the established facts." Barr v. Barr, 418 N.J. Super. 18, 31 (App. Div. 2011) (citations omitted).

A-0698-18T3

Our interpretation and enforcement of an MSA is informed both by contractual and equitable principles. An MSA "is no less a contract than an agreement to resolve a business dispute." Quinn v. Quinn, 225 N.J. 34, 45 (2016) (citations omitted). Accordingly, the customary principles of contractual interpretation are as relevant to our analysis of an MSA as they are to our analysis of any other agreement. See ibid. (reviewing "basic contract principles" when interpreting an MSA (citing J.B. v. W.B., 215 N.J. 305, 326 (2013))). However, our application of contract principles is relaxed when a divorce agreement is before us. Id. at 46.

In this context, we recognize that "[d]ivorce agreements are necessarily infused with equitable considerations and are construed in light of salient legal and policy concerns." Konzelman v. Konzelman, 158 N.J. 185, 194 (1999) (citing Petersen v. Petersen, 85 N.J. 638, 642 (1981)). Therefore, "'the law grants particular leniency to agreements made in the domestic arena' and vests 'judges greater discretion when interpreting such agreements.'" Quinn, 225 N.J. at 45–46 (quoting Pacifico v. Pacifico, 190 N.J. 258, 266 (2007)). While this discretion is guided in part by the terms of the agreement, it is also influenced by the nature of the pertinent "post-judgment issues" and the events occurring subsequent to the execution of an MSA. Id. at 46.

Guided by our goal of reaching an equitable resolution, we next review the contract principles involved in interpreting an MSA. Our fundamental objective is to "discern and implement the intentions of the parties." Id. at 45 (citing Pacifico, 190 N.J. at 266)). When the intent of the parties is clear, "[i]t is not the function of the court to rewrite or revise an agreement." Ibid. (citing Pacifico, 190 N.J. at 266). Generally, we "will not . . . make a better agreement than the parties themselves made." Holtham v. Lucas, 460 N.J. Super. 308, 320 (App. Div. 2019) (citing Quinn, 225 N.J. at 45).

When determining the intent of the parties, we "read the document as a whole in a fair and common sense manner." Hardy ex rel. Dowdell v. Abdul-Matin, 198 N.J. 95, 103 (2009) (citing DiProspero v. Penn, 183 N.J. 477, 496–97 (2005)). We attempt to apply a "reasonable construction" to the entirety of the instrument, giving effect to all parts of the contract and avoiding an interpretation that renders "portion[s] of the writing useless or inexplicable." Md. Cas. Co. v. Hansen-Jensen, Inc., 15 N.J. Super. 20, 27 (App. Div. 1951) (citations omitted). "A contract 'should not be interpreted to render one of its terms meaningless.'" Porreca v. City of Millville, 419 N.J. Super. 212, 233 (App. Div. 2011) (quoting Cumberland Cty. Improvement Auth. v. GSP Recycling Co., 358 N.J. Super. 484, 497 (App. Div. 2003)).

If the terms of a contract are clear and unambiguous, we are usually inclined to "enforce the agreement as written, unless doing so would lead to an absurd result." Quinn, 225 N.J. at 45. Nevertheless, even when the terms of an agreement appear to evince the parties' clear intent, we also consider all relevant extrinsic evidence in aid of interpreting the writing. Atl. N. Airlines v. Schwimmer, 12 N.J. 293, 301–02 (1953). Therefore, we also "must try to ascertain the intention of the parties as revealed [not only] by the language used, [but also by] the situation of the parties, the attendant circumstances, and the objects the parties were striving to attain." Celanese Ltd. v. Essex Cty. Improvement Auth., 404 N.J. Super. 514, 528 (App. Div. 2009)

## III.

We first address Peter's contention that the motion court erred in distributing the proceeds of the sale of the marital residence. In its statement of reasons, the motion court found that the mortgage principal had been reduced by $115,010.85. The judge also found that Peter had paid roughly 54% of each month's mortgage payment. After observing that Peter is entitled under the MSA to credit for the pay-down of the principal "provided for by the supplemental payment," the judge concluded that Peter "is entitled to a credit in the amount equal to [roughly 54%] of this pay-down, or $61,990.85." The judge reasoned,

"[i]t would be grossly inequitable for this court to grant [Peter] an additional $42,009.15 worth of credit when [Theresa] was proportionally paying down the principal amount, as well."

In reaching its conclusion based in part on equitable considerations, the motion court failed to interpret the contract and discern how the parties intended to credit Peter for his monthly mortgage payments at the time they executed the MSA. As we have noted, a court reviewing a contract is obliged to "try to ascertain the intention of the parties as revealed by the language used, the situation of the parties, the attendant circumstances, and the objects the parties were striving to attain." Celanese Ltd., 404 N.J. Super. at 528 (emphasis added).

The relevant paragraph of the MSA reads as follows:

> D.    . . . All net proceeds from the sale of the home shall be split evenly between the parties after all customary closing costs and the payoff of any mortgages/equity lines currently on the property. Until the home is sold, the Husband agrees to pay $2,000 per month towards the mortgage to sustain the property so that the Wife may live in the property for an additional amount of time as set forth herein, but shall receive a credit at the time of closing for whatever the pay-down on the principal was from the date of the execution of the agreement to the date of sale of the property provided for by the supplemental payment. This provision is included as while the Wife's housing expenses are her own responsibility as she is receiving appropriate alimony, the Husband has agreed to assist

A-0698-18T3

her to remain in the residence for a brief transition period as set forth herein.

Although it is clear this section was meant to govern how Peter is to be reimbursed for his contribution to the post-divorce mortgage payments, it is hardly a model of precise draftsmanship. Our plenary review leads us to conclude that when this section of the MSA is read as a whole, the language the parties agreed upon is susceptible of different interpretations.

For one thing, it is not absolutely clear what the term "supplemental payment" means. We presume it refers to the $2000 contributions that Peter agreed to make to the monthly mortgage payments that were in addition to (i.e., supplemental to) his "appropriate alimony" payments to Theresa. It is less clear, however, what is meant by the phrase "provided for by the supplemental payment."[3] Did the parties include the phrase "provided for by" so as to limit the credit to be awarded to Peter to the amount of principal pay-down directly

---

[3] We note that but for the phrase "provided for by," the MSA would be clear and unambiguous in requiring that Peter be credited for all of the principal pay-down occurring during the transition period. We are wary, however, to disregard any language in the MSA. See Porreca, 419 N.J. Super. at 233 ("A contract 'should not be interpreted to render one of its terms meaningless.'" (quoting GSP Recycling Co., 358 N.J. Super. at 497)). Rather, we think it necessary to ascertain what the parties intended by including these three words in the formulation.

attributable to his $2,000 per month mortgage payment contribution?[4]  In other words, is the phrase "provided for by" a somewhat unartful way of referring to principal pay-down "resulting from" or "attributed to" Peter's supplemental payment?

Under that interpretation, in practical effect, Theresa would likewise receive credit for the principal pay-down attributed to her monthly contribution to the mortgage payments.  That would be so notwithstanding the MSA is silent as to her entitlement to principal pay-down during the post-divorce period when she alone reaped the benefit of remaining in the marital residence.  Moreover, this interpretation would result in Theresa receiving credit for the principal pay-down despite the MSA's provision that she would be responsible for her own housing expenses.  Although the motion court arrived at this outcome, it is not clear that it did so based on assessment of the parties' intent as demonstrated by the language of the MSA.  Rather, after referencing the pertinent provision of

---

[4]  Under this interpretation, the MSA would merely be confirming that which would be true even in the absence of express language, that is, that Peter would receive credit for the principal pay-down attributed to his payment toward the mortgage during the transition period.  We do not mean to suggest that it is implausible that contract language would expressly codify that which is already self-evident, thereby leaving nothing to chance should a dispute arise as to reimbursement for his supplemental payments.  Our point, rather, is that the parties may have intended to do more than state the obvious when they agreed upon the language in this section of the MSA.

A-0698-18T3

the MSA, the court ultimately found that it would be "grossly inequitable" not to account for the fact that Theresa "was proportionally paying down the principal amount, as well."

Other interpretations of the MSA are plausible, however. For example, the pertinent paragraph of the MSA, read as a whole, might be construed to mean that Peter was entitled to be credited with all of the principal that was paid down during the transition period. Arguably, that interpretation is supported by the last sentence in the paragraph, which purports to explain why the operative preceding sentence was included. Specifically, the last sentence expressly states that Theresa was responsible for her own housing expenses and that she was receiving "appropriate alimony," that is, alimony that had been calculated to help her defray her reasonable housing expenses. The sentence concludes with the observation that Peter had agreed to assist Theresa to remain in the residence for the brief transition period until the house was sold. Because Peter was paying $2000 per month toward the mortgage in addition to alimony, in practical effect, Peter was paying for Theresa's housing expenses during the transition period. Given this financial assistance arrangement, it is conceivable the parties intended that Theresa's contribution to the monthly mortgage payment should be treated essentially as if it were rent paid by a tenant rather than a mortgage

14

payment building equity to her benefit. The current record, however, is not adequate to allow us to determine whether that is what the parties intended.

Relatedly, it also is conceivable the parties designed this section in the MSA to eliminate the financial incentive Theresa might otherwise have had to remain in the house and thus prolong what was clearly intended to be only a "brief transition period." The parties' mortgage payment arrangement permitted Theresa to live in the house at a reduced monthly cost,[5] which could have posed the risk that she would delay listing and selling the home. That risk would have been accentuated by Theresa receiving credit for the pay-down of the principal, meaning that she would recover some portion of her mortgage payments after the sale of the house. To reduce Theresa's incentive to remain in the house while paying a reduced monthly mortgage payment and accruing credit for the principal pay-down, the parties could have intended for the MSA to characterize Peter's mortgage payments as payments directed solely to paying down the principal on the mortgage.[6] Reciprocally, this would have had the effect of

---

[5] As noted, Theresa's monthly housing expenses were substantially paid for by Peter through both alimony and the $2000 mortgage payments.

[6] Characterizing the entirety of Peter's $2000 mortgage payments as payments on the principal appears to have been an obtainable object had the parties so wished. Fifty-two months and twenty-three days elapsed between the date of

classifying nearly the entirety of Theresa's mortgage payments as payments on the mortgage interest, which she would not recover after the sale of the house. Under that construction of the MSA, Theresa would have borne a higher monthly cost for remaining in the house and, accordingly, would have had a stronger incentive to sell the house in a timely manner. The record in this case has not been sufficiently developed, however, for us to determine whether disincentivizing delay by denying Theresa credit for principal pay-down during the transition period was an "object[] the parties were striving to attain" in drafting this section of the MSA. Celanese Ltd., 404 N.J. Super. at 528 (citing Onderdonk, 85 N.J. at 183–84).

We have framed arguments for divergent interpretations of the MSA to underscore that its plain language does not definitively resolve the question presented in this appeal. We recognize that the parties may have intended a different result than any we have suggested. However, that possibility further

_____

the execution of the MSA and the sale of the house. As the principal on the home was reduced by $115,010.85 during this time, the monthly reduction on the principal ranges from $2211.74 to $2170.01, depending on whether the total months are rounded up or down. Therefore, the monthly reduction in the principal would have been sufficient for the parties to characterize Peter's $2000 mortgage payments as payments solely on the principal. We note this only to illustrate that providing Peter full credit for all of his $2000 mortgage payments was a potential outcome the parties could have sought to achieve.

16

underscores the ambiguity of the language in the MSA and leaves us ill equipped to make a definitive ruling on the meaning of the MSA. Our de novo review of the MSA convinces us that more work needs to be done to ascertain how the parties intended to apportion the principal pay-down that accrued during the transition period. We are especially mindful of the foundational principle that it is a court's responsibility to enforce a contract as written, not to make a better contract for either party. Holtham, 460 N.J. Super. at 320 (citing Quinn, 225 N.J. at 45).

When the plain language of a contract does not resolve a dispute, courts must resort to extrinsic means to determine what the parties intended. Chubb Custom Ins. Co., 195 N.J. at 238 (citing Nester, 301 N.J. Super. at 210). So far as the record shows, that analysis was not undertaken in this case. Although our review of a contract is plenary, Barr, 418 N.J. Super. at 31, we decline in this instance to exercise original jurisdiction to expand the record to ascertain the intent of the parties. See Cypress Point Condo. Ass'n, Inc. v. Adria Towers, L.L.C., 441 N.J. Super. 369, 385 (App. Div. 2015) (recommending that original jurisdiction be exercised sparingly and "not when there is a need to . . . 'mak[e] independent factual findings[.]'" (alterations in original) (quoting State v.

A-0698-18T3

<u>Micelli</u>, 215 N.J. 284, 293 (2013))).  Rather, we leave that task for the motion court to complete in the first instance.

We offer no opinion on how the MSA should be construed in determining how and to what extent Peter should be credited for mortgage principal paid down during the transition period.  We hold only that further efforts must be undertaken to "ascertain the intention of the parties as revealed by the language used, the situation of the parties, the attendant circumstances, and the objects the parties were striving to attain."  <u>Celanese Ltd.</u>, 404 N.J. Super. at 528 (citing <u>Onderdonk</u>, 85 N.J. at 183–84).

We therefore vacate the order awarding credit from the proceeds of the sale of the house and direct the motion court to determine the intended meaning of the MSA and the amount of pay-down credit to award to Peter based on the intentions of the parties.  The motion court in its discretion may require the parties to present any information or testimony the court deems necessary.  The court shall make findings of fact and conclusions of law to permit appropriate appellate review, if needed.  <u>See</u> <u>R.</u> 1:7-4(a) (requiring findings by trial courts on motions appealable as of right); <u>see also</u> <u>Estate of Doerfler v. Fed. Ins. Co.</u>, 454 N.J. Super. 298, 301 (App. Div. 2018) (remanding for a court to issue detailed findings pursuant to <u>Rule</u> 1:7-4(a) after the court entered a judgment

merely for "the reasons set forth in defendant[s]' motion papers" (alteration in original)).

IV.

We turn next to Peter's contention that the motion court erred by reducing Theresa's contribution to their daughter's college expenses from 40%, per the MSA, to 10%. The relevant provision of the MSA states: "The parties should pay for the expenses in proportion to their income (60% Husband, 40% Wife) and their ability to pay."[7] (emphasis added).

The court found that at the time of the divorce, Theresa's income was $20,000 and Peter's was $180,000. The court also found that Theresa's 2016 income was $13,924. The latter figure does not account, however, for the annual $52,000 in alimony she received from Peter. The motion court concluded Theresa "plainly should have only been responsible for 10% of the expenses in proportion to their income figures" and 10% "is commensurate with . . . [Theresa's] ability to pay at this time." When Peter moved for reconsideration

---

[7] The highlighted phrase "and their ability to pay" was written by hand and initialed by both parties as an amendment to the typewritten MSA. Although it is not disputed that the parties added this language, we note the parties did not remove the parenthetical designation of "60% Husband, 40% Wife." The sentence suggests this ratio is "in proportion to their income." However, the 60/40 ratio clearly does not reflect the $180,000 and $20,000 income figures acknowledged elsewhere in the MSA.

A-0698-18T3

and argued the court had overlooked the alimony payments in calculating Theresa's income, the court stated, "[a]fter fully considering the parties' MSA, the parties' income and ability to contribute, the Court came to the conclusion that a split of [Peter] 90% and [Theresa] 10% was appropriate."

The 90/10 contribution ratio appears to be based entirely on the ratio between their respective incomes at the time of the divorce (i.e., 180,000 to 20,000). So far as the record before us shows, the motion court did not address the division of payment specified in the MSA, which was "60% Husband, 40% Wife."

We agree with the motion court that the handwritten revision to the MSA authorized the court to revisit and modify the initially agreed-upon 60/40 allocation based on an assessment of the parties' ability to pay. We nonetheless interpret this provision to mean that before a different contribution schedule could be imposed, the court must first find that Theresa was not able to pay the agreed-upon 40% share of the college expenses. As we have noted, when the parties amended the MSA with the handwritten notation, they did not delete the language in the MSA that explained that they had agreed to a 60/40 split. We therefore believe the agreed-upon contribution ratio should have been the starting point for the motion court's ability-to-pay analysis.

 A-0698-18T3

Furthermore, we do not read the handwritten addition to authorize a court to impose a new contribution schedule based solely on a comparison of the parties' income. We believe the phrase "<u>and</u> their ability to pay" immediately following the phrase "in proportion to their income" presupposes that the court must do more than simply compare their income levels. The use of a conjunctive formulation suggests the ability-to-pay caveat that was added by hand to the MSA refers to financial circumstances in addition to the difference between their respective incomes.

We do not mean to suggest that a comparison of their disparate incomes is irrelevant to the ultimate determination as to their respective abilities to contribute to their daughter's college education. The point, rather, is that the parties were aware of their income disparity when the MSA was executed and fixed the contribution ratio at 60/40. As we have noted, that specified ratio does not reflect the difference between their incomes at the time of the divorce.[8] We

---

[8] The disparity between the contribution ratio for the parties' daughter's college expenses and the parties' incomes at the time of divorce could reflect the fact that the contribution ratio accounted for Peter's alimony payments. If Peter's alimony is subtracted from his income at the time of divorce and added to Theresa's income from that time, the parties' alimony-adjusted incomes approximate the 60/40 contribution ratio. At $128,000, Peter's alimony-adjusted income accounted for 64% of the couple's total income at the time of divorce. Theresa's alimony-adjusted income of $72,000 accounted for 36% of the parties' total income from that time.

thus infer from the added handwritten language that the parties intended that the ability-to-pay determination could account for financial circumstances besides income, such as their expenses and liabilities.

We add that the issue before us is not whether the parties should have agreed upon a more equitable allocation based on their respective incomes at the time of the divorce. See Holtham, 460 N.J. Super. at 320 (stating a court must not write a better contract for one party than the one which the parties themselves have created (citing Quinn, 225 N.J. at 45)). The fact-sensitive issue presented to the motion court, rather, was whether Theresa was able to pay the 40% share contemplated in the MSA.

While "[w]e accord particular deference to the judge's factfinding," Clark, 429 N.J. Super. at 70 (citing Cesare, 154 N.J. at 411–12), such findings are only "binding on appeal when supported by adequate, substantial, credible evidence." Cesare, 154 N.J. at 412 (citing Rova Farms Resort, Inc., 65 N.J. at 484). We note the daughter's first two years of college occurred in 2015 and 2016. So far as we can tell, the record does not include evidence regarding Theresa's income in 2015. The court only made findings regarding the parties' incomes at the time of the divorce in early 2014 and Theresa's income in 2016.

A-0698-18T3

More importantly, the motion court neither added the $52,000 in alimony to its calculation of Theresa's 2016 income nor subtracted it from Peter's income. The failure to account for alimony is significant. To the extent the "ability to pay" determination authorized by the MSA is based on a comparison of the parties' respective incomes, that ratio would be significantly different if alimony were accounted for in the calculus. See supra note 8.

We reverse and remand for the motion court to convene a hearing at which both parties may present evidence and argument concerning the parties' ability to pay. The motion court in its discretion may require the parties to present any information the court deems relevant to establish their financial condition. As with the remand on the principal pay-down credit issue discussed in section III of this opinion, the motion court shall make findings of fact and conclusions of law to permit appropriate appellate review, if needed. R. 1:7-4(a). We offer no view on whether the college contribution ratio specified in the MSA should be modified, and if so, to what extent.

V.

Finally, we address Peter's contention the motion court erred in denying his requests for oral argument. Rule 5:5-4(a) provides that, "in exercising its discretion as to the mode and scheduling of disposition of motions, the court

23

shall ordinarily grant requests for oral argument on substantive and non-routine discovery motions and ordinarily deny requests for oral argument on calendar and routine discovery motions."

Peter relies on our decision in Palombi v. Palombi, where we explained that Rule 5:5-4 "has generally been interpreted to require oral argument 'when significant substantive issues are raised and argument is requested.'" 414 N.J. Super. 274, 285 (App. Div. 2010) (quoting Mackowski v. Mackowski, 317 N.J. Super. 8, 14 (App. Div. 1998)). However, Palombi also states that "the Rule still permits a trial court to exercise its discretion to deny such requests, even in cases involving 'substantive' issues." Ibid.

Although we believe, given the benefit of hindsight, that oral argument would have proved helpful to the motion court, as in Palombi, there was "no abuse of discretion in the court's determination that oral argument was unnecessary." Id. at 289. Our decision to reverse and remand on both the house sale proceeds issue and the college contribution issue is not based on the motion court's refusal to permit oral argument. Rather, our rulings in this matter are based on concerns we have expressed with the motion court's substantive findings and conclusions. We expect both parties will have the opportunity to fully present their arguments on remand.

To the extent we have not already addressed them, any additional contentions raised in this appeal lack sufficient merit to warrant discussion in this opinion.  R. 2:11-3(e)(1)(E).

Reversed and remanded.  We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-0698-18T3