**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3222-23

ROMA PIZZERIA, on behalf
of itself and all others similarly
situated,

     Plaintiff-Appellant,[1]

v.

HARBORTOUCH, f/k/a
UNITED BANK CARD,

     Defendant-Respondent.

_____

Argued March 10, 2025 – Decided March 27, 2025

Before Judges Sabatino and Gummer.

On appeal from the Superior Court of New Jersey, Law Division, Hunterdon County, Docket No. L-0637-12.

Justin A. Meyers argued the cause for appellant (Law Offices of G. Martin Meyers, PC, attorneys; Justin A. Meyers and G. Martin Meyers, on the briefs).

---

[1] The record and briefs vary in describing "plaintiff" in the singular or the plural. We choose the singular for ease of attribution, recognizing that numerous class members are affected by the litigation.

John G. Papianou and Leah A. Tedford of the Pennsylvania bar, admitted pro hac vice, argued the cause for respondent (Montgomery McCracken Walker & Rhoads LLP, attorneys; John G. Papianou, on the brief).

PER CURIAM

This appeal concerns whether the language of a court-approved 2015 settlement of a class action precludes a new class action brought against the same defendant company for conduct that occurred after the date of the settlement. The Settlement Agreement defines "Released Claims" as:

> all claims . . . whether known or unknown, that were, have been or could have been, now, in the past, or in the future, asserted or alleged in, or that relate to, the Settled Action . . . or (b) whether [defendant] . . . has the right to amend or modify any agreements, dues, assessments, discounts, fees, or charges of any kind.

The settlement terms of the class action involved the payment of millions of dollars to the plaintiff class members, plus counsel fees to plaintiff's counsel, but the terms did not include an explicit provision for prospective injunctive relief.

When the present plaintiffs, Dr. March J. Gannon and Father & Son Transmissions, filed a new purported class action case in 2023, defendant moved to reopen this settled case and to enforce the terms of the Settlement Agreement to bar plaintiffs' new case. The trial court granted the motions, holding

2 A-3222-23

plaintiffs' claims were covered by the 2015 Settlement Agreement and, thus, barred by the Settlement Agreement. Plaintiffs appealed.

Among other things, plaintiffs contend defendant and the trial court improperly imputed into the agreement a "covenant not to sue," which had not been negotiated. In response, defendant contends the plain language of the release provision bars plaintiffs from suing regarding the released claims in perpetuity, including the present lawsuit. The court must determine the intended meaning of the release language and whether it is ambiguous, particularly when considering the settlement contract in its entirety.

For the reasons that follow, we conclude the release language is ambiguous and that extrinsic evidence could aid in ascertaining its intended meaning. Consequently, we vacate the trial court's dismissal order without prejudice and remand for an evidentiary hearing to develop the record with appropriate proofs that may shed light on the contract interpretation.

I.

Because the record will be developed more fully on remand and we are not adjudicating the merits at this time, our discussion of the facts and procedural history is abbreviated.

The focus of the present case and of the previous class action lawsuit

3

concerns the business practices and fees charged to merchants by defendant Harbortouch Payments, LLC, formerly known as United Bank Card, Inc. and now known as Shift4 Payments, LLC (collectively, "Harbortouch"). Harbortouch is a leading provider of software and payment processing solutions in the United States. The company serves a range of merchants in a host of industries, providing hardware and software to those merchants to process customers' credit card payments at the point of sale.

2015 Roma Pizzeria Settlement

Roma Pizzeria ("Roma"), the named plaintiff in the previous class action, Roma Pizzeria v. Harbortouch f/k/a United Bank Card, Docket No. HNT-L-637-12 (Law Div. Feb. 20, 2015), is a merchant that entered into a contract with Harbortouch in February 2009 to receive point-of-sale services, including credit and debit card processing services. On each credit and debit card transaction it processed, Harbortouch would charge Roma and its other merchant customers various fees, as well as other monthly and annual fees for using its products and services.

In 2012 Roma sued Harbortouch in the Law Division on behalf of a putative class of Harbortouch's merchant customers. Roma alleged Harbortouch charged the class members unauthorized fees in violation of their merchant

A-3222-23

contract agreements, including "basis point" charges, "annual fees," "interchange fees," and "gateway fees."[2]

Roma asserted in the 2012 lawsuit class claims for violation of the New Jersey Consumer Fraud Act ("CFA"), N.J.S.A. 56:8-1 to -227, breach of contract, breach of the implied duty of good faith and fair dealing, and unjust enrichment. In its defense, Harbortouch maintained the fees were properly based on valid amendments to the merchant agreements. Roma requested a class award for monetary damages, as well as injunctive relief ordering Harbortouch to cease charging "excessive and/or unnecessary fees" to Roma and the other class members.

Following two years of litigation, the parties to the 2012 class action took part in mediation with a retired jurist. After three full-day mediation sessions, the parties settled the class action.

On September 22, 2014, the parties in Roma executed a Settlement Agreement. Among other things, the Settlement Agreement provided that Harbortouch would pay the plaintiff class members who did not opt out approximately $7.2 million as compensation, in exchange for the dismissal of

---

[2] For the limited purposes of this opinion remanding the litigation, we need not explain the nature and amount of these various fees.

their claims concerning the allegedly improper fees.  In addition, counsel to the plaintiff class would receive, upon court approval, attorneys' fees and expenses of approximately $940,000.[3]

After the settlement terms were preliminarily approved by the court, over 38,000 notices of the proposed settlement were sent to the class members.  The settlement notice was also published in the Wall Steet Journal and a business publication.  Five class members opted out of the proposed settlement or submitted objections to the court.

On February 20, 2015, the trial court conducted a fairness hearing pursuant to Rule 4:32-2 and approved the settlement.[4]  In a written opinion, the court certified the plaintiff class and, further, declared the terms of the settlement to be "fair, reasonable, and adequate" as required under Rule 4:32-2(e)(2).  The court noted that the sole objector had raised concerns about Harbortouch's ability in the future to charge merchants "never-ending arbitrary fee assessments . . . with little or no legal monetary remedy," and the termination

---

[3]  According to the documents supplied to us, the law firms who had represented the plaintiff class in the 2012 case are different from the law firm that represents plaintiffs in the present case.

[4]  Although they were not supplied to us as part of the briefing, counsel at our request provided us before oral argument with the trial court's eight-page written opinion approving the settlement, as well as a transcript of the fairness hearing.

6

fees charged if merchants withdrew from the services. The court acknowledged that objection but did not make a finding about whether it had merit. The court simply noted the objector could have excluded itself from the class and chose not to do so.

Evidently, after the court approved the settlement in February 2015, the settlement funds were paid and the matter was closed. Final judgment was entered on February 20, 2015. According to the Settlement Agreement, the court retained "exclusive jurisdiction over the Parties and Class Members for all matters relating to this action and the settlement, including the . . . enforcement of the Agreement."

The present class action against Harbortouch was filed in the United States District Court for the District of New Jersey in 2023 by two named representative plaintiffs. Plaintiff Dr. Marc J. Gannon is an optometry provider who entered into an agreement with Harbortouch, doing business as Shift4 Payments, LLC ("Shift4"), in December 2010, so that he could offer his patients the ability to pay by credit card. Co-plaintiff Father & Son Transmissions, Inc. similarly entered into an agreement with Shift4 in September 2010 for credit card processing services.

In their complaint, plaintiffs alleged Harbortouch charged the class

7

members (termed by the parties as "the Gannon class") various unauthorized fees in violation of their merchant contract agreements, amounting to hundreds of millions of dollars. The complaint alleged defendant has "effectively ignored rates agreed to in the Merchant Customer Application forms" for "the last ten years" by "arbitrarily increasing the rate far above the 'interchange rates' published by the major credit card issuers." The 2023 complaint described the fees at issue as the "interchange PLUS" rate, the "discount fee," a so-called "bill stuffer" that introduced "bundled" category rates in February 2020, and new "miscellaneous" charges that began in July 2020.

Plaintiffs in the present case alleged these "new 'bundling' categories . . . increased the 'interchange rate' substantially above the 'interchange rates' published by the credit card issuers, with the excess fee being billed to the Merchant Customer." Plaintiffs asserted this "bundled rate" has resulted in defendant's collection of millions of dollars of excessive fees from the class of merchant customers. Plaintiffs further contended the miscellaneous charges are unauthorized fees and that defendant has failed to disclose to merchants the nature or purpose of those charges.

Plaintiffs asserted class claims for violation of consumer protection statutes from numerous states, including the New Jersey CFA, breach of

contract, breach of the implied duty of good faith and fair dealing, and unjust enrichment. Plaintiffs requested a class award for monetary damages, as well as injunctive relief.

Harbortouch contends the present class action by the Gannon class plaintiffs is precluded by release language within the 2015 settlement in the Roma class action. Harbortouch accordingly moved to reopen the Roma case in the Law Division to obtain a judicial declaration that the Gannon class action is barred by the 2015 settlement. The Gannon plaintiffs disagreed and opposed Harbortouch's application. Meanwhile, the District Court granted Harbortouch's motion to stay the federal action, pending the outcome of the state court proceeding.

The same Law Division judge who had approved the 2015 settlement heard oral argument on the motions. On May 8, 2024, the judge granted the parties' joint application to reopen the case and enforced the 2015 Settlement Agreement against plaintiffs. In a written decision, the court held the Gannon claims are "Released Claims" that were relinquished in the Roma settlement, and thereby the current claims are precluded.

Citing "significant similarities" between the Roma and Gannon class complaints, including their allegations about Harbortouch's fee structure in its

merchant agreements, the court concluded the classes "made the same allegations," challenged "the same fees," and raised "the same theories of relief" in both cases. The court rejected plaintiffs' argument that they could not have "raise[d] these claims prior to the Settlement Agreement [in Roma]," holding the Roma class "clearly did raise the same issues back in 2012." The court held the Gannon claims are not "future claims," but "the same claims regarding the interchange fees addressed by the Roma class, and are thus covered by the Settlement Agreement." Counsel have represented to us that the federal court subsequently dismissed the Gannon complaint. This appeal by plaintiffs ensued.

II.

The dispute before us essentially boils down to a disagreement over whether the terms of the 2015 Settlement bar the present claims by the Gannon class members alleging conduct by Harbortouch that occurred after the February 2015 final judgment in Roma. The court's task is to determine the intended meaning of the release-related language, as expressed within various sections of the Settlement Agreement.

The Roma Settlement Agreement contains several provisions relevant to our present purposes. Section 1.29, which we quoted in part in our introduction previewing the issues, defines the class members' "Released Claims" as follows:

**1.29 Released Claims.** "Released Claims" means and includes all claims, allegations, causes of action, liabilities, damages, demands, rights, equitable relief, legal relief, or administrative relief, of any basis or source, whether known or unknown, that were, have been or could have been, now, in the past, or in the future, asserted or alleged in, or that relate to, the Settled Action by Class Members, including, but not limited to, any and all allegations and claims asserted by Class Members in the Complaint filed in the Settled Action, as well as any claims by Class Members relating to: (a) whether Harbortouch's . . . charges for (1) Annual Fees, (2) UBC Gateway Fees, (3) IMS Reporting Fees, (4) IRS Processing Validation Fees, (5) PCI Annual Fees, or (6) any other dues, assessments, discounts, fees, or charges of any kind are unauthorized by any agreement or violate or are subject to claims for damages, refund, or other relief under the laws or common law of any state or territory in which Class Members or Harbortouch reside or of the United States; or (b) whether Harbortouch . . . has the right to amend or modify any agreements, dues, assessments, discounts, fees, or charges of any kind.

[(Emphasis added).]

Other potentially relevant provisions, Sections 2.1 through 2.3, declare that the purposes of the Roma class and Harbortouch in executing the Settlement Agreement were as follows:

**2.1 Purpose of the Settlement.** The purpose of this Settlement is to forever settle and compromise any and all claims, disputes, and controversies that were or could have been raised against Harbortouch in the Settled Action by Class Members relating to the (a) Annual Fee, (b) UBC Gateway Fee, (c) IMS Reporting

11

A-3222-23

Fee, (d) IRS Processing Validation Fee, (e) PC1 Annual Fee or (f) any other fee or charge of any kind that Harbortouch . . . assessed to the Class Representative or any Class Member, <u>or relating to whether Harbortouch . . . has the right to amend or modify any agreement or fee or charge of any kind</u>.

**2.2 Plaintiff's Reasons for Entering into the Settlement.** Class Counsel and the Class Representative believe that the claims asserted in the Settled Action have merit. Class Counsel and the Class Representative, however, recognize the uncertain outcome and the risk of any litigation, especially in complex actions such as this, as well as the difficulties and delays inherent in such litigation. Class Counsel and the Class Representative are also mindful of potential issues of proof and defenses to the claims asserted in the Settled Action, including the defenses Harbortouch asserted and the potential obstacles to class certification. In light of the above, Class Counsel and the Class Representative believe that the settlement set forth in this Settlement Agreement confers substantial benefits upon the Settlement Class and each of the Settlement Class Members, is fair, reasonable, and adequate, and is in the best interest of the Settlement Class and each of the Settlement Class Members.

**2.3 Harbortouch's Reasons for Entering into the Settlement.** Harbortouch denies, and continues to deny, liability for any of the claims asserted in the Settled Action. Harbortouch, however, desires to settle the Settled Action . . . in order to: (a) avoid the burden, expense, and uncertainty of continuing to litigate the Settled Action; (b) avoid the diversion of its resources and personnel required by continuing to litigate the Settled Action; and (c) put to rest any and all Released Claims.

A-3222-23

[(Emphasis added).]

Another portion of the Settlement Agreement, Section 5.2 regarding "unknown" claims, specifies:

> **5.2 Waiver of Unknown Released Claims.** It is the desire of the Settling Parties to fully, finally, and forever settle, compromise, and discharge all of the Class Representative's and the Class Members' Released Claims <u>which were or which could have been asserted in this action</u>, whether known or unknown, against all Released Persons. As a consequence, the Class Representative and each Class Member may hereafter discover facts in addition to or different from those which he or she now knows or believes to be true with respect to the subject matter of the Released Claims, but the Class Representative and each Class Member, upon the Effective Date, shall be deemed to have, and by operation of the Final Settlement Order and Judgment shall have, <u>fully, finally, and forever settled and released any and all Released Claims, known or unknown</u> . . . <u>which then exist, or heretofore have existed</u> . . . against all Released Persons. The Class Representative acknowledges, and each Class Member shall be deemed by operation of the Final Approval Order and Judgment to have acknowledged, that the foregoing waiver was separately bargained for and a key element of the Settlement of which this release is a part.
>
> [(Emphases added).]

As part of its arguments for preclusion of the federal action, Harbortouch particularly stresses that Section 1.29 encompasses and releases claims that "have been or could have been, now, in the past, <u>or in the future</u>, asserted or

alleged in, or that relate to, the Settled Action by Class Members . . . ." (Emphasis added). However, the word "future" is not mentioned within the related provisions in Sections 2.1, 2.2, 2.3, nor 5.2, nor elsewhere in the Settlement.

On that subject of timing, plaintiffs draw our attention to the language in Section 1.29 referring to the release of claims "<u>that were, have been or could have been</u>, now, in the past, or in the future, <u>asserted or alleged</u> . . . ." (Emphasis added). Plaintiffs contend that, to the extent their federal lawsuit is based on defendant's conduct that post-dates the 2015 final judgment, those claims could not "have been" asserted in the <u>Roma</u> case because the new conduct had not yet occurred. Plaintiffs also point to the above-quoted text of Section 5.3, which refers—using the present and past tense—to the settlement of claims that were "known or unknown . . . which <u>then exist, or heretofore have existed</u> . . . ." (Emphasis added).

In response, Harbortouch spotlights the language of Section 2.1, contending it preserved the company's future ability to alter its contracts and charges, explicitly maintaining "the right to amend or modify any agreements, dues, assessments, discounts, fees, or charges of any kind." Hence, the federal lawsuit transgresses the company's right to direct its post-settlement business

practices. Simply stated, Harbortouch argues it negotiated, and paid millions of dollars in settlement, for "peace" in the future.

Both parties respectively assert positions about what the 2015 Settlement Agreement does <u>not</u> say explicitly. Plaintiffs argue Harbortouch is improperly imputing into the agreement a perpetual "covenant not to sue" by class members in the future. Harbortouch, meanwhile, contends that plaintiffs are wrongfully imputing into the agreement a "prospective injunction," which was pled as a claim for relief in the complaint but not obtained by the plaintiff in <u>Roma</u>.

A settlement agreement is a form of a contract and must be interpreted in accordance with basic principles of contract law. <u>Pascarella v. Bruck</u>, 190 N.J. Super. 118, 124–25 (App. Div. 1983). The principles of law that govern contract interpretation are well established. "Generally, the terms of an agreement are to be given their plain and ordinary meaning." <u>M.J. Paquet, Inc. v. N.J. Dep't of Transp.</u>, 171 N.J. 378, 396 (2002). The interpretation of contract terms "are decided by the court as a matter of law unless the meaning is both unclear and dependent on conflicting testimony." <u>Bosshard v. Hackensack Univ. Med. Ctr.</u>, 345 N.J. Super. 78, 92 (App. Div. 2001).

A court faced with a disagreement over how to interpret a contract must first decide if an ambiguity exists. "An ambiguity in a contract exists if the

terms of the contract are susceptible to at least two reasonable alternative interpretations. . . ." Nester v. O'Donnell, 301 N.J. Super. 198, 210 (App. Div. 1997). Therefore, in "interpreting a contract, a court must try to ascertain the intention of the parties as revealed by the language used, the situation of the parties, the attendant circumstances, and the objects the parties were striving to attain." Celanese Ltd. v. Essex Cnty. Improvement Auth., 404 N.J. Super. 514, 528 (App. Div. 2009).

In instances where there is an apparent ambiguity about the meaning of contractual terms, a court is permitted to consider extrinsic evidence beyond the "four corners" of the contract's text. As the Supreme Court has instructed:

> [W]e allow a thorough examination of extrinsic evidence in the interpretation of contracts. Such evidence may "include consideration of the particular contractual provision, an overview of all the terms, the circumstances leading up to the formation of the contract, custom, usage, and the interpretation placed on the disputed provision by the parties' conduct." "Semantics cannot be allowed to twist and distort [the words'] obvious meaning in the minds of the parties." Consequently, the words of the contract alone will not always control.
>
> [Conway v. 287 Corp. Ctr. Assocs., 187 N.J. 259, 269 (2006) (alteration in original) (citations omitted).]

When courts are called upon to enforce contractual agreements, their main objective is to carry out the mutual intent of the parties. Ibid. If the intent of

A-3222-23

the parties is ambiguous, a plenary hearing on the matter may be necessary.  See

Quinn v. Quinn, 225 N.J. 34, 45 (2016) (finding that "[t]o the extent that there

is any ambiguity in the expression of the terms of a settlement agreement, a

hearing may be necessary to discern the intent of the parties at the time the

agreement was entered and to implement that intent"); see also Barr v. Barr, 418

N.J. Super. 18, 38 (App. Div. 2011) (reversing and remanding for a plenary

hearing to discern the intent of the parties when drafting the settlement

agreement).

The potential need for an evidentiary hearing to determine the parties'

intent was aptly illustrated in our opinion in Grow Company Inc. v. Chokshi,

403 N.J. Super. 443 (App. Div. 2008).  In that case we examined whether a

settlement agreement between a former employee and a company precluded

future claims. There, the trial court granted summary judgment and dismissed

the case, applying the terms of an earlier settlement agreement as a basis for

dismissing the plaintiff's current claims.  Id. at 450.

Notably in Grow, the settlement agreement included a covenant not to sue.

Id. at 451.  Nonetheless, the plaintiff alleged that both before and for four years

after the settlement agreement, the defendant improperly disclosed trade secrets,

and that the settlement agreement did not preclude claims based on conduct

17

occurring after execution of the settlement agreement.  Id. at 452, 456.  In the settlement terms "neither party conceded nor denied . . . [the] merit to what [plaintiff] had alleged in [the] action."  Id. at 465.  In light of the lack of concessions as to liability, we concluded in Grow that:

> the settlement agreement resolved none of the parties' disputes; it merely memorialized the parties' stipulation that the existing litigation would be ended, that certain consideration not revealed in the record would be paid by [defendant] and the other defendants, and that limits would be placed on any future litigation.
>
> [Ibid.]

We accordingly reversed the partial summary judgment decision and remanded for further proceedings in the trial court, instructing that:

> [T]here is a need to obtain a better understanding of the details of [plaintiff's] claims, as well as an understanding of the allegations in the earlier suit, before determining whether the nature of the claims asserted against [defendant] in this action, assuming they survived the settlement agreement, requires that they now be barred.  In short, the complex circumstances upon which this novel theory turns, which have not been thoroughly developed in the trial court, do not present a sufficient foundation for the entry of summary judgment.
>
> . . . .
>
> Our determination [is that] that the judge's interpretation of the settlement agreement was premature, and that it cannot be said, on this record,

18

whether the claims asserted against [defendant] are all barred by the settlement agreement.

. . . .

These broad but inconsistent definitions [of the scope of parties involved in the settlement] suggest <u>an ambiguity that would not appear to be amenable to resolution without information relating to its formation and other existing extrinsic evidence</u>.

. . . .

It is true that whether a contract provision is clear or ambiguous is a question of law. Ambiguity is determined not by adopting an interpretation preferred by the judge but by determining whether the provision in question is "susceptible to at least two reasonable alternative interpretations." <u>Because the scope of the settlement agreement cannot be determined by solely relying upon the parties' writing</u>, which may be plausibly interpreted in different ways, summary judgment in favor of [defendant] on this point was precluded.

[<u>Id.</u> at 470, 474, 476 (emphases added) (citations omitted).]

We have a comparable situation of ambiguity here. The assorted provisions of the 2015 Settlement Agreement do not provide a consistent and clear answer as to whether it precludes future claims based on Harbortouch's post-settlement conduct. For the moment, subject to further development of the record through extrinsic evidence, both parties have presented competing and

19

what tentatively appear to be plausible interpretations.

Subject to the trial court's gatekeeping function, such relevant extrinsic evidence conceivably may include draft provisions that the parties exchanged during the negotiations process, and emails or other communications. It may be enlightening if, for example, defendant had proposed the insertion of a covenant not to sue provision, or, on the other hand, whether plaintiff had proposed to include the terms of a prospective injunction, and why such proposals were rejected. We conceive that such evidence of the drafting history would be exempted from the evidentiary privilege normally afforded to offers of compromise. See N.J.R.E. 408 (instructing that offers of compromise "shall not be excluded when offered for another purpose" that is distinct from proving or disproving the liability for, invalidity of, or the amount of a disputed claim when the offer was made).

The matter is therefore remanded to the trial court to conduct an evidentiary hearing to develop the record with extrinsic evidence and to reexamine the likely intent of the parties respecting future claims of the kind being asserted by the Gannon class members here. In its discretion, the trial court may permit reasonable pre-hearing discovery in advance of the hearing, although no discovery may be taken of the mediator. At the conclusion of the

20

hearing, the court shall issue a renewed determination of its findings and whether plaintiffs' claims are barred, in full or in part, by the 2015 Settlement Agreement.

Vacated and remanded for an evidentiary hearing. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division